UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                           Criminal No. 07-389 (JMR/FLN)

    Plaintiff,

    v.                                              **ORDER AND REPORT AND
                                                 RECOMMENDATION**

02 - James Martin Bruflodt,

    Defendant.

_____

David F. Steinkamp, Assistant United States Attorney, for the Government.
Kurt B. Glaser, Esq., for Defendant.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on February 4, 2008, on Defendant's motion for disclosure or production of confidential informants [#43], Defendant's motion to suppress evidence [#45], Defendant's motion for disclosure of grand jury transcripts [#49], Defendant's motion for a bill of particulars [#57], Defendant's motion for suppression of statements [#59], Defendant's motion to disclose grand jury proceedings, or in the alternative, for an in camera inspection: motion to dismiss indictment [#61], and Defendant's motion for disclosure of specific evidence [#62].  At the hearing, the Court received testimony from St. Paul Police officer Andrew Shoemaker ("Officer Shoemaker") and the Defendant.  The Government submitted three exhibits.[1]   The matter was referred to the undersigned for Report and

---

[1] Gov't Ex. 1 is a search warrant dated March 18, 2004.
   Gov't Ex. 2 is a search warrant dated February 2, 2005.
   Gov't Ex. 3 is a copy of a phone message.
 Gov't Ex. 4 - transcript of interview with Defendant

Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  For the reasons which follow,

the Court orders that Defendant's motions numbered 43, 49, 57, and 62 be granted in part and denied

in part and recommends that Defendant's Motions numbered 45, 59 and 61 be denied.

## I.   FINDINGS OF FACT

### 1.   Testimony of Officer Shoemaker.

Officer Shoemaker testified that he has been assigned to the Minnesota Gang Strike

Force as an investigator since 2001.  (Tr. 22.)  He specializes in the investigation of motorcycle

gangs.  (*Id*.)

Officer Shoemaker stated that he first met Mr. Bruflodt in 1995 or 1996 when he was

assigned to patrol duties on the east side of St. Paul.  (Tr. 24.)  Since that first meeting, Officer

Shoemaker has made two warrant arrests on the Defendant in the St. Paul area, one arrest on or

about March 18, 2004 and another on or about February 2, 2005.  (*Id*.; Gov. Ex. 1, 2.)  Officer

Shoemaker testified that on November 6, 2006, he received a phone message at work that the

Defendant, who was incarcerated at the time, wanted to meet with him.  (*See* Gov't Ex. 3; Tr.

23.)  Officer Shoemaker testified that prior to receiving the phone message, the last time he had

contact with the Defendant was in March 2004 when he executed a search warrant at the

Defendant's address in St. Paul (Tr. 25).

Officer Shoemaker stated that after receiving the phone message on November 6, 2006,

he verified that the Defendant was in still custody and then proceeded to the Ramsay County jail

to speak with the Defendant.  (*Id*.)  He testified that he later learned the Defendant was in

custody on a charge for possession of a stun gun by a prohibited person. (*Id*.)  He met with the

Defendant in an interview room of the jail.  (Tr. 27.)  The Defendant was ushered into the room

2

by two guards and then he and Officer Shoemaker were left alone to speak with one another.

(*Id.*)  Officer Shoemaker did not record the conversation.  (*Id.*)

Officer Shoemaker testified that the Defendant entered the interview room, smiled, shook hands with him, and sat down.  (*Id.*)  The Defendant told Officer Shoemaker that he wanted to talk about his mother who had been arrested on a narcotics charge and hoped that Officer Shoemaker could do something to keep her from being charged.  (Tr. 28, 38.)  The Defendant also hoped that Shoemaker could help secure leniency on the Defendant's own stun gun charge. The Defendant told him that he would be willing to provide information on various criminal activity in exchange for the officer's help.  (Tr. 29.)  The Defendant said he could give Officer Shoemaker information about some explosives.  (Tr. 37.)  One of the topics also discussed was the possibility of Officer Shoemaker talking to a judge regarding the Defendant's case in order to get a break on sentencing.  (Tr. 31, 37.)  According to Officer Shoemaker, the interview lasted less than an hour.  (Tr. 28.)  He testified that he did not make any threats to the Defendant.  (Tr. 31.)  He testified that it was a very "easygoing," "amicable" conversation.  (Tr. 31.)  He stated that at the end of the interview, they shook hands and the Defendant asked him when he was coming back.  (Tr. 30.)  The officer testified that he knew the Defendant was represented by a public defender on the stun gun charge.  (Tr. 39.)

Officer Shoemaker stated that on November 9, 2006, he returned to the jail to speak with the Defendant.  (*Id.*)  Between November 6th and November 9th, Officer Shoemaker did not bring any charges against the Defendant and that the Defendant remained in jail on the stun gun charges.  (*Id.*)  For the second interview, Officer Shoemaker brought another officer along, Rob Merrell of the narcotics unit.  Officer Shoemaker recorded the interview which took place in an

interview room at the jail.  (Tr. 30-31.)  Officer Shoemaker testified that he intended to speak

with the Defendant about his association with the Hell's Outcast motorcycle gang and his

involvement in narcotics distribution in the metro area.  (Tr. 32.)  Officer Shoemaker stated that

before the interview began, he read the Defendant his *Miranda* rights.  (*Id*.)  Shoemaker stated

that at no time during the interview did the Defendant say that he did not want to speak with the

investigators and never asked to speak with an attorney.  (Tr. 33.)

   Officer Shoemaker testified that he discussed in vague terms how he could help the

Defendant and his mother but he did not make any promises.  (Tr. 34.)  He stated he did not

make any promises as to what the outcome would be if the Defendant continued his statement

with the officer.  (*Id*.)  Officer Shoemaker did agree to speak with the prosecutor and the judge in

charge of the stun gun case against the Defendant.  (*Id*.)  He told the Defendant that if the

Defendant helped him recover a large amount of explosives, he would speak to the judge and try

to get a deal on the Defendant's sentence.  (Tr. 41.)  At the end of the interview, Officer

Shoemaker and the Defendant shook hands and the officer said that they would speak again.  (Tr.

35.)  The Defendant's mother was not charged with a crime in connection with the investigation

underway before these two interviews were conducted.  (Tr. 42.)

   Officer Shoemaker testified that at no time during the interview did the Defendant

request an attorney or say that he did not want to continue the interview without a lawyer (Tr.

30.)  He testified that the Defendant became emotional at one point during the interview when he

was talking about his children, but not so emotional that he could not continue the interview.

(Tr. 34.)

   **2. Defendant's Testimony.**

4

The Defendant testified that he is 40 years old.  He did not graduate from high school but did earn his GED.  (Tr. 45.)  He stated that in late 2006, he was addicted to methamphetamines and took the drug daily.  (Tr. 45-46.)  By 2006, he had been taking the drug for about three or four years.  (Tr. 46.)  He has been convicted of a number of felonies including burglary and receiving stolen property.  (Tr. 53.)  He testified that he knew the *Miranda* warning informs a person that they have a right to remain silent and a right to a lawyer.  (Tr. 54.)  He stated that he has heard or read the *Miranda* warning many times.  (Tr 54-55.)  He stated that he understood his rights.  (Tr. 56.)

The Defendant testified that he was in jail in early November 2006 because he was charged with felony possession of a stun gun.  (Tr. 47.)  While he was in jail, he learned that his mother had been arrested on a drug charge and wanted to ask Officer Shoemaker whether he could keep his mother from being charged with a crime; in exchange, he would give the officer information about an individual in possession of a large amount of explosives.  (*Id*.)  In their first meeting, after the Defendant explained his predicament and the kind of information he had to share, Officer Shoemaker said he would return in a day or two and let the Defendant know if he could help him out.  (Tr. 48.)  The Defendant also asked Officer Shoemaker if there was anything the officer could do to help his own case and Shoemaker said he would talk to the judge to see if he could negotiate a reduced sentence.  (*Id*.)

The Defendant testified that when Officer Shoemaker returned to speak with him on November 9, 2006, he came with another officer, Rob Merrell.  The Defendant testified that at the beginning of the second interview, Officer Shoemaker read him his *Miranda* rights.  (Tr. 48.)  He stated that he was surprised to see another investigator there with Officer Shoemaker.  (Tr.

5

49.)  He testified that the officers asked him about many topics in addition to the explosives.

(*Id.*)  They asked him about a number of people who were believed to be in a motorcycle gang.

(Tr. 59.)  The Defendant stated that he only wished to discuss the explosives and asked many

times throughout the interview if, in exchange for information about the explosives, Officer

Shoemaker would help him and his mother.  (*Id.*)  Yet, the Defendant testified that he answered

questions about topics other than the explosives because he felt obligated to do so in order to

secure leniency for both himself and his mother.  (Tr. 50.)

The Defendant testified that he was appointed a public defender to represent him on the

stun gun charge.  (Tr. 47.)  He testified that Officer Shoemaker never questioned him about his

stun gun case or what he did that lead to the charges; Officer Shoemaker did however ask the

Defendant about his sentence in the stun gun case.  (Tr. 60.)  He testified that the "deal" struck

between him and Officer Shoemaker was that, in exchange for information about explosives, the

officer would talk to the person in charge of his mother's case in order to get the charges against

her dropped and that he would talk to the judge about reducing the Defendant's sentence.  (Tr.

62.)

## II.  CONCLUSIONS OF LAW

### A.  Motion for Disclosure or Production of Confidential Informants [#43]

The motion is **GRANTED in part** and **DENIED in part**.  The motion is **GRANTED** to

the extent that the government plans to prove any fact to which the informant was a witness.  *See*

*Roviaro v. United States*, 353 U.S. 53, 60-61 (1957).  The motion is **DENIED** to the extent the

Government does not plan on proving any facts to which the informant was a witness.

### B.  Motion for Disclosure of Grand Jury Transcripts [#49] and Motion to Disclose Grand Jury Proceedings, or in the alternative, for an *In Camera* Inspection: Motion

**to Dismiss Indictment [#61; #62].**

The Defendant contends that his Fifth Amendment rights were violated because hearsay testimony was the only evidence presented to the grand jury.  The Defendant's motion is **DENIED**.  "It has long been recognized that there is no constitutional preclusion of the use of hearsay testimony in grand jury proceedings."  *U.S. v. Rossbach*, 701 F.2d 713, 716 (8th Cir. 1983) (citing *Costello v. U.S.,* 350 U.S. 359 (1956)).  The Defendant urges the Court to adopt the rule from the Second Circuit's holding in *U.S. v. Esteppa*, 471 F.2d 1132, 1136-37 (2d Cir. 1972), that the government's use of hearsay testimony that misleads the Grand Jury will result in dismissal of the indictment.  The Court declines to do so because that case has been expressly disowned by the Eighth Circuit.  *See Rossbach*,  701 F.2d at 716;  *U.S. v. Powers,* 482 F.2d 941, 943 (8th Cir. 1973).

### C.  Motion for Bill of Particulars [#57]

The Defendant's motion is **GRANTED in part** and **DENIED in part**.  The Grand Jury alleges that the Defendant conspired to distribute methamphetamine with Mr. Delaverio and other persons, "whose names are known and unknown to the grand jury." (Indict. at 1.)  The motion is **GRANTED** to the extent the Government shall set forth in a bill of particulars the names of any other co-conspirators whose names are known to the Grand Jury.

The Grand Jury alleges that it does not know when the charged conspiracy began.  (*Id.*) The Grand Jury alleges however that it continued through on or about April 2007.  (*Id.*)  The motion is **GRANTED** to the extent the Government shall set forth in a bill of particulars the earliest date it intends to prove the Defendant was a participant in the conspiracy.  The motion is **DENIED** in all other respects.

### D.  Motion for Disclosure of Specific Evidence [#64]

In this motion, the Defendant requested disclosure of four different kinds of evidence. The only remaining evidence that the Government has not disclosed are documents relating to, or recordings made from a "wire" supplied by the Defendant by law enforcement authorities when he conducted a controlled buy of narcotics from Edward Devalerio.  To the extent that the Defendant seeks recordings or documents relating to this controlled buy, the motion is **GRANTED**.  The motion is **DENIED** in all other respects.

### E.  Motion to Suppress Evidence [#45]

The Defendant contends that the government never disclosed a search warrant authorizing the searches conducted on Defendant's residences dated February 1, 2005 and March 18, 2004; the government only disclosed drafts of the warrant applications. The Defendant contends that the search was conducted without a warrant, without probable cause and lacking exigent circumstances.

At the hearing, the Government submitted the signed, notarized search warrants dated February 1, 2005 and March 18, 2004.  (*See* Gov't Ex. 1, 2.)  Searches conducted pursuant to a warrant are reviewed to determine whether the information in the warrant application and supporting affidavit provided probable cause for the search.  *Illinois v. Gates*, 462 U.S. 213, 236 (1983).  "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place."  *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir.2000) (citing *Gates*, 462 U.S. at 236).  When determining whether probable cause exists, a court does not evaluate each piece of information independently, but, rather, considers all of the facts for

their cumulative meaning. *United States v. Allen,* 297 F.3d 790, 794 (8th Cir.2002).   The task of

a court issuing a search warrant is "simply to make a practical, common sense decision whether,

given all the circumstances set forth in the affidavit . . .  including the 'veracity' and 'basis of

knowledge' of persons supplying hearsay information, there is a fair probability that contraband

or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238; *see also*

*United States v. Salter*, 358 F.3d 1080, 1084 (8th Cir.2004).

In reviewing the decision of the issuing court, this Court must ensure that the issuing

court " 'had a substantial basis for . . . conclud[ing] that probable cause existed.' " *United States*

*v. Oropesa*, 316 F.3d 762, 766 (8th Cir.2003) (quoting *Gates*, 462 U.S. at 238-39.)  Since

reasonable minds may differ on whether a particular search warrant affidavit establishes

probable cause, the issuing court's determination is accorded great deference. *United States v.*

*Wajda*, 810 F.2d 754, 760 (8th Cir.1987) (citing *United States v. Leon*, 468 U.S. 897, 914

(1984)).

The Court concludes that, given the totality of the circumstances described in the

affidavit in support of the search warrant dated March 18, 2004, a reasonable person could

believe there was a fair probability that drugs, drug paraphernalia and books, records and other

documents evidencing drug dealing would be present at the residence.  (*See* Gov't Ex. 1.)  In the

affidavit, Officer Shoemaker notes that the police department was contacted by concerned

citizens residing in the area of the Defendant's rented residence who reported that they had

observed many vehicles parked in the alley or by Defendant's garage for short periods of time,

often under 15 minutes.  The concerned citizens told law enforcement that the activity was

busiest between the hours of 10 p.m. and 4 a.m.  The concerned citizens also reported that the

Defendant would not dispose of his trash behind the house; instead he would load the trash in his truck and dispose of it elsewhere. The affiant stated that in his training and experience, those involved in the sale of unlawful narcotics often dispose of residential trash at remote locations to avoid trash searches by narcotics investigators. The affiant stated that, during law enforcement's investigation of the Defendant, they did find that at least some trash was disposed of behind the house. A search of that trash revealed a glass pipe with methamphetamine residue and a partially smoked marijuana cigarette. The affiant also made numerous trips past the Defendant's house and observed many vehicles present in the garage area. Given these circumstances, a reasonable person could conclude that there was a fair probability the listed items in the warrant would be found at the residence.

The Court also concludes that, given the totality of the circumstances described in the affidavit in support of the search warrant dated February 2, 2005, a reasonable person could believe there was a fair probability that the following items would be present at the residence: documents showing residence, a handgun and shoes, boots or other footwear with a tread pattern consistent with impressions left at a burglary crime scene. The affiant stated that a neighbor of the Defendant was given permission by the Defendant and his roommate, Newton, to use their washing machine and dryer. They became friends and the neighbor sold his car to Newton. The neighbor was not paid in full for the car. On February 4, 2005, when the neighbor went to the Defendant's apartment to pick up his laundry, there were a number of people in the apartment including the Defendant, his girlfriend, Newton, and a man named Brian Blue. Blue pointed a gun at the neighbor and demanded his wallet and the neighbor gave him $300. Neither the Defendant nor his roommate did anything to defend the neighbor. Immediately after this

incident, the neighbor drove off in the car that he had sold to Newton.  When the neighbor

returned home, he found the front door of his apartment kicked, the cabinets in his apartment

open and their contents on the floor.  When the neighbor confronted Newton the next day,

Newton said he had been taken hostage by Blue who forced Newton to show him where the

neighbor lived. When Newton and Blue arrived at the apartment, Blue burglarized it.  Newton

said the Defendant had put Blue up to the robbery and the burglary.  The investigators took

pictures of foot prints left on the door of the neighbor's apartment.  The print had a distinct tread

pattern that investigators believed could be matched if the footwear could be located.  (Gov't Ex.

2 at 3.)  Given theses circumstances, a reasonable person could conclude that there was a fair

probability the listed items in the warrant would be found at the residence.  The Defendant's

motion must be denied.

**F.  Motion for Suppression of Statements [#59]**

**1.  The Defendant did not have a Sixth Amendment right to counsel in this case when Officer Shoemaker interviewed him.**

The Defendant challenges the admissibility of his statements made to Officer Shoemaker

during the interview.  The Defendant argues that his Sixth Amendment right to an attorney in

this case was violated when he was being questioned by Officer Shoemaker without his attorney

present.   The Defendant contends that he invoked his right to counsel when he appeared in

Ramsay County Court to face a charge of felony possession of a stun gun.

The Sixth Amendment right to counsel is offense specific.  *Texas v. Cobb*, 532 U.S. 162,

167 (2001); *McNeil v. Wisc.*, 501 U.S.171, 175 (1991); *Maine v. Moulton*, 474 U.S. 159, 180

n.16 (1985).  "It cannot be invoked once for all future prosecutions, for it does not attach until a

prosecution is commenced, that is 'at or after the initiation of adversary judicial criminal

proceedings - whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *McNeil*, 501 U.S. at 175.  In this case, the Defendant's Sixth Amendment right to counsel attached with respect to the offense for which he was in custody, but not for the conspiracy to distribute methamphetamine charges he currently faces in this case.  No adversary judicial criminal proceedings had yet begun on the conspiracy charge and therefore Defendant's right to counsel had not attached.

   **2. Defendant's *Miranda* rights were not violated in the first interview.**

   The Defendant contends that his statements made to Officer Shoemaker during the first interview on November 6, 2006, should be suppressed because they were made during a custodial interrogation without a *Miranda* warning.

   "*Miranda* warnings are required for official interrogations only where 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir. 1985) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).  "While *Miranda* may apply to one who is in custody for an offense unrelated to the interrogation, incarceration does not *ipso facto* render an interrogation custodial." *Leviston v. Black*, 843 F.2d 302, 304 (8th Cir. 1988). Even when the defendant is incarcerated, whether a defendant is in custody for *Miranda* purposes is determined by examining the objective circumstances of the situation, using the perspective of a reasonable person in the suspect's position. *See California v. Beheler*, 463 U.S. 1121, 1125 (1983).  Courts must consider the totality of the circumstances when making this determination. *Id*.  A defendant's incarceration is one relevant factor. *U.S. v. Chamberlain*, 163 F.3d 499, 502 (8th Cir. 1999).

In *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990), the Court of Appeals for the Eighth Circuit stated that "the relevant factors to be considered in making a determination of custody include an accused's freedom to leave the scene, and the purpose, place, and length of the interrogation."  The accused's freedom of action during the interrogation is a critical factor, while the remaining factors "have inconclusive, independent relevance to the determination of custody."  *Id.*  The Eighth Circuit developed a six-factor test for determination of custody.  *Id.* at 1349.  These factors are:

1.  Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest;

2.  Whether the suspect possess unrestrained freedom of movement during questioning;

3.  Whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;

4.  Whether strong arm tactics or deceptive stratagems were employed during questioning;

5.  Whether the atmosphere of the questioning was police dominated; and

6.  Whether the suspect was placed under arrest at the termination of the questioning.

The Eighth Circuit has recognized that, while these factors are important, "[t]he ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest. And the court must consider whether the *historical facts*, as opposed to the one-step removed *Griffin* factors, establish custody.  The debatable marginal presence of certain judicially-created factors that ostensibly tend to aggravate the existence of custody cannot create the functional equivalent of formal arrest where the most important circumstances show its absence."  *United States v.*

13

*Czichray*, 378 F.3d 822, 828 (8th Cir. 2004).

**a.  Advice Given by Officer.**

Officer Shoemaker did not give a *Miranda* warning during this interview.  This fact however is not particularly significant because Officer Shoemaker did not know what to expect when he came to the jail to speak with the Defendant.  He came to the jail upon the Defendant's request to speak about an unspecified topic.

**b.  Restraint.**

The Defendant was incarcerated at the time of the interview.  The interview took place in an interview room at the jail and there were no guards present.  Officer Shoemaker testified that he did not remember if the Defendant was wearing handcuffs.  (Tr. 27.)

**c.  Who Initiated Contact**.

This factor weighs against a conclusion that the Defendant was in custody for *Miranda* purposes because the Defendant initiated contact with Officer Shoemaker.  On November 6, 2006, Officer Shoemaker received a message at work that an incarcerated individual - the Defendant - wished to speak with him. (*See* Gov't Ex. 3.)  At this first interview on November 6, the Defendant told Officer Shoemaker that he wanted to provide information about criminal activity in exchange for criminal charges being dropped against his mother.  Officer Shoemaker said he would look into the matter and would return to the jail to speak with the Defendant.

**d.  Tactics Used.**

The *Griffin* court also considered whether the interviewing agents used strong arm tactics or deceptive stratagems.  *Griffin*, 922 F.2d at 1351.  There is no evidence that Officer Shoemaker used strong arm tactics.  To the contrary, Officer Shoemaker testified that the

14

interview was friendly, and that they shook hands both before and after the interview.

### e.  Domination of Interview.

The *Griffin* court also observed that an "interrogation which occurs in an atmosphere dominated by the police . . . is more likely to be viewed as custodial than one which does not." *Griffin*, 922 F.2d at 1351-52.  In this case, the interview took place in an interview room at a jail, but there were no guards in the interview room, only the Defendant and Officer Shoemaker.  The atmosphere of the interview was not therefore dominated by the police.

### f.  Placement Under Arrest.

The Defendant was already incarcerated at the time of the interview.  During the interview, rather than discussing the need to detain the Defendant for any of the information given during the interview, Officer Shoemaker stated that he would speak with the judge in Ramsay County assigned to the Defendant's stun gun case in an attempt to secure a shorter sentence for the Defendant.

### g.  Totality of the Circumstances.

The most important factor in this case is that the Defendant initiated contact with Officer Shoemaker.  The interview arose out the Defendant's desire to give information about criminal activity to Officer Shoemaker in exchange for the officer's help in dropping the charges against his mother.  The interview was friendly and there were no guards present.  The Defendant was not in custody for *Miranda* purposes.

### 3.  Defendant's *Miranda* rights were not violated in the second interview.

The Defendant argues that he did not knowingly and voluntarily waive his *Miranda* rights in the second interview.  After being informed of their *Miranda* rights, a suspect's waiver

15

of their Fifth Amendment privilege against self-incrimination is only valid if it is voluntarily, knowingly, and intelligently made. *Id.* at 444; *United States v. Syslo*, 303 F.3d 860, 866 (8th Cir. 2002). A waiver is knowing if it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). It is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id*. It is the Government's burden to show by a preponderance of evidence that the suspect's waiver meets these standards. *Miranda*, 384 U.S. at 473; *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

In this case, the Defendant's waiver was voluntarily made because it was not secured by intimidation, coercion or deception. There is no evidence that Officer Shoemaker or Officer Merrell attempted to intimidate the Defendant. Moreover, their actions did not amount to coercion or deception. After the first interview, Officer Shoermaker told the Defendant that he would speak with other law enforcement officers about the information the Defendant gave and also about the possibility of having the charges dropped against his mother and about the possibility of securing a shorter sentence for the Defendant. Shoemaker did not, however, make any definitive promises. The Defendant in this case initiated contact with the officer and was willing to provide information for the possibility of leniency for his mother and himself.

The Defendant's waiver was knowingly and intelligently made. The Defendant in this case is forty years old and earned his GED. Officer Shoemaker read him his *Miranda* rights at the beginning of the interview and the Defendant was also given a form stating those rights that he initialed and signed. The Defendant has a long history of criminal violations and testified that he was familiar with and understood his *Miranda* rights.

16

**4.  The Defendant's statement in the second interview was not obtained involuntarily.**

The Defendant argues that he was pressured to confess in the second interview by the presence of the second officer and by promises of leniency.  "The appropriate test for determining the voluntariness of a confession is whether the confession was extracted by threat, violence, or direct or implied promises such that the defendant's 'will [was] overborne and his capacity for self-determination critically impaired.'" *U.S. v. Kilgore*, 58 F.3d 350, 353 (8th Cir. 1995) (quoting *Colombe v. Connecticut*, 367 U.S. 568, 602 (1961)).

This determination is made under a totality of the circumstances test.  *Tippitt v. Lockhart*, 859 F.2d 595, 598 (8th Cir. 1988).  The court looks to such factors as age and education level of the Defendant, lack of advice as to constitutional rights, length of detention, "repeated and prolonged nature of questioning," and the use of physical punishment.  *Id*.  A promise of leniency in the process of obtaining a confession does not render it *per se* involuntary.  *Kilgore*, 58 F.3d at 597.

There is absolutely no evidence that Officer Shoemaker or the narcotics officer who was with him used physical punishment with the Defendant.  As to whether the questioning was "repeated" or "prolonged," this was the second interview of the Defendant conducted by Officer Shoemaker in three days.  However, at the end of the first interview, Officer Shoemaker told the Defendant that he would have to speak with other investigators about the Defendant and his mother in order to determine whether he could secure leniency for either one of them.  It was not a surprise to the Defendant that Officer Shoemaker returned.  The Defendant testified that he was surprised that he returned with another officer and that the officers wanted to know about criminal activity other than the explosives he had mentioned in the first interview.  Nonetheless,

before the officers began to question the Defendant, they read him his *Miranda* rights - rights which the Defendant testified he understood.

As to Defendant's argument that he was pressured to waive his rights by promises of leniency, the Court does not find it persuasive.  In *Kilgore*, the Defendant thought he would receive no jail time if he confessed.  58 F.3d at 353.  The court concluded that the Defendant's belief alone did not render the confession involuntary.  *Id*.  The court stressed that the applicable test was whether the Defendant's "will was overborne and his capacity for self-determination critically impaired."  *Id*.  Here, the Defendant's will was not overborne.  He was read his *Miranda* rights at the beginning of the interview, rights which he testified he understood.  Even though the Defendant did not expect to be questioned about any topics other than the explosives, the failure of officers to inform the Defendant of the subject matter of the interrogation does not invalidate the Defendant's  waiver of his *Miranda* rights.  *See Colorado v. Spring*, 479 U.S. 564, 574 (1987).  Furthermore, Officer Shoemaker never promised a certain result in either Defendant's case or his mother's case in exchange for the Defendant's information regarding criminal activity.  Instead, Officer Shoemaker said he would see what he could do.  It is clear that Defendant's will was not overborne in this case by discussions of leniency or the other circumstances of the interview.

### III.  ORDER AND RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Disclosure or Production of Confidential Informants [#43] is **GRANTED in part** and **DENIED in part**.  The motion is **GRANTED** to the extent that the government plans to prove any fact to which the informant was a witness.  *See Roviaro v. United*

18

*States*, 353 U.S. 53, 60-61 (1957).  The motion is **DENIED** to the extent the Government does not plan on proving any facts to which the informant was a witness.

Based upon all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Disclosure of Grand Jury Transcripts [#49] is **DENIED**.

Based upon all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for a Bill of Particulars [#57] is **GRANTED in part** and **DENIED in part**.  The motion is **GRANTED** to the extent the Defendant seeks a bill of particulars with the names of any other co-conspirators known to the Grand Jury.  The motion is **GRANTED** to the extent that Defendant seeks a bill of particulars setting forth the earliest date it intends to prove Defendant was a participant in the conspiracy.  The motion is **DENIED** in all other respects.

Based upon all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Disclosure of Specific Evidence [#64] is **GRANTED in part** and **DENIED in part**.  To the extent the Defendant seeks disclosure of recordings or documents relating to a controlled buy from Edward Devalerio, the motion is **GRANTED**.  The motion is **DENIED** in all other respects.

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Disclose Grand Jury Proceedings, or in the Alternative, for an *In Camera* Inspection: Motion to Dismiss Indictment [#61; #62] be **DENIED**.

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence [#45] be **DENIED**.

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion for Suppression of Statements [#59] be **DENIED**.

19

DATED: March 11, 2008                    s/ *Franklin L. Noel*
                                         FRANKLIN L. NOEL
                                         United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **March 28, 2008**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **March 28, 2008,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.